BOARD OF POLICE COMMISSIONERS OF THE CITY OF ANSONIA *v.* EARL STANLEY
(AC 25578)

Dranginis, Gruendel and Hennessy, Js.

Argued September 16—officially released December 27, 2005

*William T. Blake, Jr.*, for the appellant (defendant).

*Francis A. Teodosio*, for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. The defendant, Earl Stanley, appeals from the judgment of the trial court vacating on public policy grounds the arbitration award (award) reinstating his employment with the Ansonia police department (department).[1] On appeal, the defendant claims that the court improperly (1) vacated the award of reinstatement and (2) denied his motion to confirm the award. We affirm the judgment of the trial court.

At the time of this dispute, the city of Ansonia (city) and the Connecticut Independent Police Union, Local 13 (union), of which the defendant was a member, were parties to a written collective bargaining agreement (agreement) effective from July 1, 2000, to June 30, 2003. The agreement provided that when a nondepartmental written complaint is filed against an employee, the employee must be provided notice of such complaint within seven days of its being filed and that the complaint must be dismissed if not acted on by the plaintiff, the board of police commissioners (board), within five months of the date the complaint was filed.[2] The

---

[1] The collective bargaining agreement in place between the city of Ansonia and the defendant's union provides: "No grievance addressing a non probationary employee's discharge, termination or demotion, including severity of punishment, can be submitted directly to the Connecticut Board of Mediation and Arbitration without the approval of the union." On August 5, 2002, the defendant waived representation by the Connecticut Independent Police Union, Local 13. The union did not participate in the initial hearing or the arbitration and agreed to be bound by the decision. The defendant retained private counsel and now appeals individually.

[2] Article 14, § G, of the agreement states: "Whenever a nondepartmental complaint is made against an employee or group of employees, such complaint shall be submitted in writing under oath. . . . Any employee against whom a written complaint has been filed, must be provided a copy of such complaint within seven (7) days of its being filed. Such complaint shall be dismissed if not acted on by the Board of Police Commissioners within five (5) months of the date the complaint being filed."

agreement further provided for review of an employee's discharge, termination of employment or demotion by a panel of arbitrators.

The defendant was employed as a police officer with the department until his employment was terminated on August 6, 2002, following complaints of harassment, intimidation and false statements to the department. Specifically, four women complained of inappropriate language and conduct by the defendant, including the use of sexual language, grabbing of their buttocks, harassment with a police car's flashing lights and observation by the defendant of one of the women while she was getting out of a shower.[3] During the department's internal affairs investigation of the complaints, the defendant made false and misleading statements about his conduct.[4] On August 6, 2002, the board heard argu-

___

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[4] The following additional facts, set forth by the arbitrators in their statement of the case, describe the nature of the complaints against the defendant. They are set forth in a footnote for brevity and clarity in the opinion, and not to diminish their importance.

"During the hearing, many issues came to the attention of the [board]. The first issue was sexual misconduct. This was first discussed with reference to a nineteen year old resident, [S]. Those allegations first surfaced on January 15, 2001. [S] gave two written statements under oath to the [department] whereby she alleged that [the defendant] had used 'unwelcome and unsolicited sexual and vulgar language' and had 'grabbed her buttocks.' . . . [S] was at the August 6, 2002 hearing, testified credibly and her testimony was not rebutted by the [defendant], who elected not to testify.

"On January 19, 2001, the [department] turned the matter over to the state police and decided not to conduct an internal investigation. Because of the ongoing criminal investigation, the city felt justified in withholding the [S] complaint from [the defendant] until May 6, 2002. . . .

"The [S] allegations resulted in a criminal investigation by the state police. On January 29, 2001, the state police interviewed [S], who gave them a sworn statement. On February 16, 2001, the state police also received a sworn statement from [B], who alleged that she had been subjected to lewd, obscene and sexually harassing conduct. . . . In her statement, [B] alleged being subjected to 'obscene gestures' and being touched on 'her ass' on

ment, received evidence and concluded by a unanimous

several occasions. She also recounted being offered liquor at a wedding reception by [the defendant] when she was seventeen in the midst of his making 'lewd and obscene comments' to her. Furthermore, [B] insisted that [the defendant] was 'doing everything possible to have sex' with her. She indicated that [the defendant] 'illuminated [her] car with his spotlight' and followed her on numerous occasions in his cruiser.

"[B], who was a coworker of [S] and introduced her to [the defendant], indicated that the [defendant] had 'blown kisses' and 'licked his lips in a sexual way in front of [S].' Both women claimed in their statements to be afraid of the [defendant] and feared that he would hurt them, and alleged that the [defendant's] advances were resisted and rejected. It is not clear, however, what role, if any, the [B] statement played in the action which was to come next. It does appear that the [S] complaint was the main reason why the state police brought criminal charges against [the defendant]. Obviously, the [B] complaint had corroborative value and was very significant. However, the same contained details of behavior that involved [B] and went beyond corroboration.

"As revealed at the time of the hearings on this matter, the charges by the state police also prompted the [department] to begin an internal investigation. The officer assigned to do the investigation was Lieutenant Michael Abbels. It is not clear from the record when the [department] got a copy of the [B] statement. It is clear, however, that the [defendant] did not receive a copy of the same until around May 6, 2002.

"[The defendant] was arrested on April 6, 2001, and charged with sexual assault in the fourth degree. . . . On August 30, 2001, a third complaint surfaced from a twenty-two year old female, [M], who had had similar problems with the [defendant]. . . .

"Like [B], [M] complained that [the defendant] frequently stopped her by flashing a 'spotlight into her car' and asked her 'to come to his house.' [M] also complained that she was watched by the [defendant] while she was getting out of the shower and while he 'was in an Ansonia police car,' and 'flashed the blue and red lights on the roof of his car and drove away.' This type of on duty conduct was also complained of by [B]. Given other acts complained of by [M], the latter conduct appeared calculated to be a use of [the defendant's] police authority inappropriately. Similar conduct included [the defendant] assuring [M] that he would try and help her out 'with the prosecutor of the Derby court' when she got arrested because she had caused a fight. At that time, [the defendant] 'leaned towards [the victim's] face with his face' as if to kiss her. . . .

"[The defendant's] case came before the court on December 14, 2001, at which time the [defendant] applied for accelerated rehabilitation after undergoing a 'psychosexual evaluation and risk assessment.' . . . Neither the [M] nor [B] matters were addressed at that proceeding. [The defendant] did not receive a copy of the [M] complaint until May 6, 2002. Neither were these matters discussed during the risk assessment conducted prior to [the

vote of the participating commissioners that the evi-

defendant's] court appearance. . . . [The defendant] did admit 'having sexually charged conversations with the victim and her friend' [and] touching . . . [S] and seemed 'to recognize that they were inappropriate.' . . .

"During his court appearance, [the defendant's] attorney indicated that his client recognized that 'whatever behavior he engaged in that day (with [S]) wasn't appropriate.' . . . In granting the accelerated rehabilitation, the court noted that the victim did not object and that 'this was not an on duty misuse of authority.' It did find that [the defendant's] conduct was 'sufficient to warrant an arrest,' and that the age difference between the victim and [the defendant] made the 'limited touching' which occurred 'inappropriate.' . . .

"While the court did not make a determination of guilt, it did not exonerate the [defendant]. As a result of the proceedings, [the defendant] was placed on a two year probation and admonished not to have contact with [S]. He was further required to continue in counseling, make restitution to the victim for lost wages, pay up to $1000 for her counseling and to perform 100 hours of community service. . . . The court's determination on [the defendant's] application did not involve consideration of the on duty conduct alleged by [B] and [M] and the [K] statement, which will be discussed below.

"During the spring of 2002, with the criminal charges being disposed of, the internal affairs investigation intensified. As a result, [the defendant] was questioned on May 6, 2002, and he was advised of the identity of the women who had accused him and the nature of the accusations. He was told of the alleged 'unsolicited sexual vulgarity and sexual contact' and 'inappropriate use of a police cruiser and lights.' According to . . . Abbels, the interrogator, [the defendant] denied the allegations made by the complainants. [Abbels] also stated that, in his opinion, the [defendant] 'intentionally lied to him' and 'tried to mislead him.' . . .

"To buttress his conclusion, Abbels pointed out that [the defendant] 'denied trying to have a relationship with [S] or [B],' but 'finally admitted that he was trying to have a sexual relationship with them.' [Abbels] also pointed out that the [defendant] denied shining or flashing his lights at females in cars. However, Abbels indicated that [another officer], who had been in [the defendant's] patrol car 'many times,' indicated to him that [the defendant] did so on many occasions while [that officer] was present. Based on the above circumstances, Abbels concluded that he needed to conduct another meeting with [the defendant] to clear the 'many inconsistencies.' He scheduled and held said meeting on June 14, 2002. . . .

"On July 10, 2002, a fourth statement was given to the [department]. The same related to conduct which occurred two years prior. The statement had a familiar tone to it as the forty-one year old female, [K], discussed 'being flagged down by [the defendant].' [K] knew [the defendant] well because he had dated her daughter. According to the statement, on one occasion the [defendant] encountered her and told her that she 'looked nice.' He subsequently told her, 'Why don't you pull up your shirt and show me your breasts?' [K] stated that 'in the past, an Ansonia police car would

dence substantiated a finding that the defendant had violated seven sections of the rules and regulations of the Ansonia police department (duty manual), and, thus, the board terminated the defendant's employment.[5] Pursuant to the agreement between the city and

park next to [her] house and shine the spotlight into [her] bedroom window.' While [K] admitted not being able to discern who the officer was, she said that 'after I confronted [the defendant] about it, it never happened again.' . . .

"On the above date . . . Abbels presented his internal affairs investigation report. On July 23, 2002, the [defendant] was given a copy of the same and notice that the report was being presented to the board . . . on July 30, 2002. He was told that on July 30, 2002, the [board] 'will convene a hearing to consider whether any disciplinary action should be taken against you.' That hearing was postponed and reconvened on August 6, 2002." (Citations omitted.)

[5] The board found that violations of the following sections of the duty manual were substantiated:

"2.1.6 Truthfulness—Speak the truth at all times and under all circumstances. In cases in which [a sworn member] is not allowed by the regulations of the Department to divulge facts within its knowledge, he will decline to speak on the subject."

"2.1.10 Respect—extend the proper courtesy and respect toward all members of the Department and others at all times."

"2.1.11 Civility—be civil, orderly, diligent, discreet, courteous and patient as a reasonable person is expected to be in all situations and shall not engage in any altercation, physical or otherwise whether on duty or not, with any other member or employee of the Department."

"2.1.13 Oath of Office, Code of Ethics—carry out their oath of office and the code of police ethics to the best of the member's ability."

"2.3.3 Neglect of Duty—conducting or omitting the performance of one's duty such that performance is not in accordance with established and ordinary duties or procedures, or which constitutes use of unreasonable judgment in the exercising of any discretion granted to a police officer."

"2.3.22 Duty Time Limited to Police Work—conducting personal business while on duty or devoting any of his 'on duty' time to any activity other than that which relates to police work or performing any police duty in uniform for the purposes of private gain, unless properly authorized."

"[4.4.3 D.] Neglect of Duty or Disobedience of [O]rders—police officers while on duty shall devote their time and energies to the duties and responsibilities of rank, grade, or position to which they are assigned. In carrying out those duties, officers shall direct and coordinate their efforts in such a manner as will tend to establish and maintain the highest standard of efficiency. Any conduct or omission which is not in accordance with one's established and ordinary duties and procedures, or which constitutes use of unreasonable judgment in the exercise of the discretion granted to an individual officer, shall be considered neglect of duty."

the union, the defendant grieved the termination, and both parties agreed to submit the grievance to arbitration for a determination of whether the defendant's employment was terminated for just cause and the appropriate remedy if it was not. The arbitration panel (arbitrators) held hearings and received evidence on the merits of the unrestricted submission on March 19 and April 11, 2003.

In their written award, the arbitrators concluded that the board had violated the defendant's procedural rights under the agreement and thus did not have just cause to terminate his employment. They concluded that the complaints used by the board in terminating the defendant's employment were of the sort covered by the agreement and were not excluded because of an ongoing criminal investigation involving the defendant or by past practice. They further concluded that because three of the complaints were not acted on within five months, which may have curtailed the defendant's ability to defend against those complaints, the board improperly had relied on them in reaching its decision.[6] The arbitrators ordered that the defendant be reinstated, but declined to include back pay as part of the remedy. Examining the record as a whole, the arbitrators found that there was "ample evidence of some on duty misconduct" and determined: "While we believe that the [defendant's] rights were violated, we do not feel that an award of back pay is warranted. Our conclusion is based on an examination of the record as a whole. Said evidence clearly establishes that the [defendant] was not exonerated of the charges brought by the state. Neither did he rebut the allegations made against him at the August 6 hearing. A preponderance of the evidence also establishes that a significant part

---

[6] It was unclear to the arbitrators whether the defendant was given notice of an additional complaint within seven days of its receipt on July 10, 2002, but it was clear that the city acted on the complaint within the five month limitation period.

of [the defendant's] misconduct occurred while on duty, a factor not considered during his court proceeding. It is clear to [the arbitrators] from Judge Sequino's comments, however, that she would have considered this type of misconduct to be serious if the case before her (the [S] complaint) had involved the same.

"Based on a preponderance of the evidence, the [arbitrators] also conclude that [the defendant] used his position of authority to influence and intimidate the victims. He also violated the trust placed on him by the public since he preyed on their fear of his position as a police officer. The evidence also establishes that [the defendant's] statements were inconsistent, if not outright contradictory, at various stages of the internal affairs investigation, which made it look as if he was less than candid with the investigators and had something to hide. Besides that, [the defendant] did not express remorse, though he admitted through counsel in court that he engaged in lewd and sexually charged conversations which were inappropriate, especially for an individual who is a police officer. Also of concern to the [arbitrators] is the disturbing nature of [the defendant's] physical touching, which by credible accounts, was unsolicited, unwanted and rebuked and which, by his account, was intended to facilitate having sexual relations with the victims."

The city filed an application to vacate the award on December 9, 2003, pursuant to General Statutes § 52-418 on the grounds that the award (1) violated established public policy against harassment, particularly of a sexual nature; (2) usurped the authority of the board as set forth in the city charter, the agreement, the department's duty manual and General Statutes §§ 7-274 and 7-276; (3) conflicted with established and acceptable standard criminal investigation policy; and (4) forced the department to notify any officer suspected of criminal misconduct within seven days of a complaint regard-

less of the investigation. The defendant filed an answer to the plaintiff's application and a motion to confirm the award. The court found that the award violated the clearly defined public policies against harassment and sexual misconduct, as well as the public policy requiring good conduct on the part of police officers, and vacated the arbitration panel's award of reinstatement. This appeal followed.

On appeal, the defendant claims that the court improperly vacated the award because the court (1) did not rely on the findings of fact and conclusions of law in the award, (2) relied on dicta in the award in reaching its decision, (3) did not identify a clearly defined public policy that had application to the facts found by the arbitrators and (4) improperly found that his reinstatement violated public policy. The defendant further claims that the court improperly denied his motion to confirm the arbitration award as (1) there was no basis for overturning the award and (2) the award conformed to the submission.[7]

I

The defendant's first two arguments question the scope of the court's review of the arbitrators' award reinstating the defendant, specifically that the court did not rely on the panel's findings in rendering its decision.

We begin by stating the standard of review for arbitration awards. "Because [courts] favor arbitration as a means of settling private disputes, [courts] undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* 252 Conn. 467, 474,

---

[7] Because we affirm the court's action vacating the award, we need not separately address the merits of the defendant's claim that the award be confirmed.

747 A.2d 480 (2000). "The standard of review relative to arbitration awards depends on the nature of the challenge. With a voluntary, unrestricted submission to an arbitrator . . . the court may only examine the submission and the award to determine whether the award conforms to the submission. . . . In making such a comparison when the submission is unrestricted, the court will not review the evidence or legal questions involved, but is bound by the arbitrator's legal and factual determinations. . . .

"Certain conditions do exist, however, under which [courts] conduct a more searching review of arbitral awards. In *Garrity* v. *McCaskey*, 223 Conn. 1, 6, 612 A.2d 742 (1992), our Supreme Court reiterated that there are three grounds for vacating an award when the submission is unrestricted. These grounds arise when the award (1) rules on the constitutionality of a statute, (2) violates clear public policy or (3) contravenes one or more of the statutory proscriptions of General Statutes § 52-418." (Internal quotation marks omitted.) *Metropolitan District Commission* v. *Local 184*, 77 Conn. App. 832, 838, 825 A.2d 218 (2003). In the present case, the defendant's challenge implicates only the second exception; accordingly, it will be the focus of our discussion. "[W]hen a challenge to a voluntary arbitration award rendered pursuant to an unrestricted submission raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review." (Internal quotation marks omitted.) *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, 89 Conn. App. 680, 683, 874 A.2d 839, cert. denied, 275 Conn. 912, 882 A.2d 673 (2005).

"Our Supreme Court has determined that in reviewing questions of fact in arbitration proceedings, a reviewing court must determine whether there is substantial evidence in the record to support the arbitrators' findings

of fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) Id., 686. The limited scrutiny with which we review an arbitration panel's findings of fact dictates that "it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the [arbitration panel.]" (Internal quotation marks omitted.) *Burns* v. *General Motors Corp.*, 80 Conn. App. 146, 152, 833 A.2d 934, cert. denied, 267 Conn. 909, 840 A.2d 1170 (2003).

## A

We first examine the defendant's argument that the court did not rely on the factual findings and legal conclusions of the arbitrators in making the public policy determination. Our review of the record reveals that there was substantial evidence in the record to support the arbitrators' factual findings that the defendant committed some on duty misconduct, behaved inappropriately, used his position of authority to influence and to intimidate the victims, and made misleading statements during the internal affairs investigation. The record includes not only evidence on which the arbitrators determined the board could rely in its actions against the defendant, but also evidence that the arbitrators found was used by the board in violation of the defendant's contractual rights under the agreement. The arbitrators' finding disallowing the use of certain complaints in the board's decision to terminate the defendant's employment stands alone as a matter of contract interpretation, limiting the conduct of the parties bound by that contract. Accordingly, although the arbitrators' interpretation of the contract prohibited the board from using certain evidence of the defendant's misconduct, the arbitrators made findings as to that evidence. Those factual findings are a part of the record

from which the arbitrators may fashion a remedy for the procedural violation.[8]

The arbitrators heard testimony and made credibility determinations on the basis of the evidence before them. We are required to give deference to arbitrators' factual determinations, including questions of credibility. See *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, supra, 89 Conn. App. 686. The full record considered by the arbitrators includes the complaints by several women about inappropriate conduct by the defendant, the misdemeanor charge of sexual assault in the fourth degree[9] and the inconsistent statements that the defendant made to the internal affairs investigators. Collectively, those facts provide substantial evidence for the arbitrators' factual findings of the defendant's misconduct warranting denial of back pay and, thus, are entitled to the deference ordi-

_____

[8] We leave undisturbed the arbitrators' finding of a procedural violation.

[9] After his arrest, the defendant signed a written waiver regarding the disciplinary policies in the agreement. As a result, as noted by the arbitrators in their award, a disciplinary hearing was not required until the "outcome of the criminal charge . . . or independent verification of alleged misconduct." The defendant applied for accelerated rehabilitation and was placed on probation for two years for his actions. The granting of a motion for accelerated rehabilitation does not terminate the underlying criminal charges. Final judgment does not occur until the completion of the terms of accelerated rehabilitation, including probation, and an order by the court dismissing the charges. See *State* v. *Angelo*, 25 Conn. App. 235, 239–40, 594 A.2d 24 (finding that motion to grant accelerated rehabilitation is not final judgment for purposes of appeal and that right of appeal does not ripen until charges dismissed), cert. denied, 220 Conn. 911, 597 A.2d 335 (1991); see also *State* v. *Trahan*, 45 Conn. App. 722, 732, 697 A.2d 1153 ("only right that the defendant may earn under the accelerated rehabilitation statute is the right to a dismissal of the charges against him, a right that is expressly conditioned on satisfactory completion of the period of probation" [internal quotation marks omitted]), cert. denied, 243 Conn. 924, 701 A.2d 660 (1997). The outcome of the criminal charge for purposes of this action also does not occur until that time. Accordingly, the misdemeanor charge of sexual assault in the fourth degree was properly before the board at the August 6, 2002 hearing and was an appropriate subject for factual findings by the arbitrators.

narily given to arbitrators' factual findings. See *Groton v. United Steelworkers of America*, 254 Conn. 35, 51–52, 757 A.2d 501 (2000) (even when review of arbitrator's decision is de novo, reviewing court gives deference to arbitrator's factual determinations). Having found substantial evidence on the record to support the arbitrators' findings of fact, a reviewing court may apply all of those findings as the basis for the public policy inquiry. See *Schoonmaker v. Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429–32, 747 A.2d 1017 (2000).

B

The defendant next argues that the court relied on dicta in the award in reaching its decision. "Dictum includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding in the case. . . . As we have previously recognized, however, it is not dictum when a court . . . intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy . . . . Rather, such action constitutes an act of the court which it will thereafter recognize as a binding decision." (Citations omitted; internal quotation marks omitted.) *Middletown Commercial Associates Ltd. Partnership v. Middletown*, 53 Conn. App. 432, 435, 730 A.2d 1201, cert. denied, 250 Conn. 919, 738 A.2d 657 (1999). Here, the defendant characterizes as dicta the arbitrators' factual findings regarding back pay. We do not find his argument persuasive. The submission to the arbitration panel was twofold, first to determine whether the termination of the defendant's employment was for just cause and, second, to determine the appropriate remedy if the defendant's employment was terminated improperly. The arbitrators' findings as to the defendant's conduct were directly related to their decision to deny the defendant back pay. Accordingly, the

findings were not mere dicta, but findings of fact necessary to the arbitrators' conclusion.

## II

The defendant's remaining arguments challenge the court's finding that stalking, harassment and intimidation by a police officer, and making material falsehoods during an internal police investigation constitute a public policy violation. We continue to review the defendant's claims de novo, giving deference to the arbitrators' factual findings. See *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, supra, 89 Conn. App. 683.

Our review of a public policy challenge to an arbitral award is limited in scope. "This court's role in addressing a public policy challenge has been confined largely to determining whether, as gleaned from a statute, administrative decision or case law, there exists a public policy mandate with which an arbitral award must conform." (Internal quotation marks omitted.) *Metropolitan District Commission* v. *Local 184*, supra, 77 Conn. App. 842. Our Supreme Court has set forth a rubric for resolving public policy challenges. "*Schoonmaker* require[s] a two-step analysis in cases such as this one in which a party raises the issue of a violation of public policy in an arbitral award. First, we must determine whether a clear public policy can be identified. Second, if a clear public policy can be identified, we must then address the ultimate question of whether the award itself conforms with that policy." (Internal quotation marks omitted.) Id., 839. The public policy which would be violated by enforcement of the arbitral award must be "well defined and dominant, as is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . . The party challenging the award bears the burden of proving that illegality or conflict

with public policy is clearly demonstrated." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* supra, 252 Conn. 475. Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the board's award clearly violates an established public policy mandate. See id.

A

Under the foregoing standard, we begin by examining the relevant public policies. The issue is whether reinstatement of the defendant violates a well defined public policy. The city contends that there is a clear public policy against stalking and harassment, particularly of a sexual nature.[10] We agree that such policy is well defined and dominant, as determined by reference to the laws of this state. General Statutes §§ 53a-181d[11] and 53a-181e[12] each express the legislature's condemnation of stalking and conduct that elicits fear in its victims. The public policies of this state also clearly prohibit disorderly behavior, including offensive conduct toward others and invasions of privacy. See General Statutes § 53a-182 (a).[13] This state also has a public

[10] The court framed its public policy conclusion, in part, in terms of the well recognized state and federal policies against sexual harassment in the workplace. Because we conclude that the award was in violation of other public policies, we need not reach the question of on duty sexual harassment.

[11] General Statutes § 53a-181d (a) provides: "A person is guilty of stalking in the second degree when, with intent to cause another person to fear for his physical safety, he wilfully and repeatedly follows or lies in wait for such other person and causes such other person to reasonably fear for his physical safety."

[12] General Statutes § 53a-181e (a) provides: "A person is guilty of stalking in the third degree when he recklessly causes another person to reasonably fear for his physical safety by wilfully and repeatedly following or lying in wait for such other person."

[13] General Statutes § 53a-182 (a) provides in relevant part: "A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (2) by offensive or disorderly conduct, annoys or interferes with another person . . . or (7) commits simple trespass, as provided in section 53a-

policy against sexual assault of varying degrees, including the conduct the defendant was charged with and for which he received accelerated rehabilitation. See General Statutes § 53a-73a.[14]

In addition, under federal law there is a clearly defined public policy against civil rights violations by municipalities and their agents. Federal law imposes liability on "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. The United States Supreme Court has extended that liability to include deprivations of civil rights in which the violation is the result of municipal policy or custom. See *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690–91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). The touchstone of establishing municipal liability for civil rights deprivations by municipal employees is that the municipality itself cause or is implicated in the constitutional violation. *Amnesty America* v. *West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). Although actual action by the municipality meets that standard, the definition is not so limited. A custom of conduct by the municipality that allows an employee's inappropriate behavior to continue may expose it to liability as well. See id., 126 ("[t]hus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused

---

110a, and observes, in other than a casual or cursory manner, another person (A) without the knowledge or consent of such person, (B) while such other person is inside a dwelling, as defined in section 53a-100, and not in plain view, and (C) under circumstances where such other person has a reasonable expectation of privacy."

[14] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (2) such person subjects another person to sexual contact without such other person's consent . . . ."

by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983" [internal quotation marks omitted]); *Love* v. *Granby*, United States District Court, Docket No. 3:02CV1960 (D. Conn. July 12, 2004) ("[p]laintiff must provide evidence from which a reasonable juror could conclude that municipal inaction such as the persistent failure to discipline subordinates who violated civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*" [internal quotation marks omitted]). Those well defined statutes and case law demonstrate that there is a clear public policy against municipal endorsement or acquiescence in employee civil rights violations.

## B

Having concluded that the court properly based its decision on a well defined public policy against inappropriate behavior by a police officer on and off duty, and against implied municipal endorsement of such conduct, our analysis shifts to whether enforcing the award reinstating the defendant to the police force violates those public policies.[15] "[A public policy] challenge is premised on the fact that the parties cannot expect

[15] The court also identified a public policy mandating good behavior for police officers and requiring police officers to be honest and law-abiding, emanating from General Statutes § 7-276 and the duty manual of the department. We agree that there is a need for public confidence in the police force and that there is a general consideration that "[g]ood behavior is a requirement for police officers." *South Windsor* v. *South Windsor Police Union*, 41 Conn. App. 649, 659, 677 A.2d 464, cert. denied, 239 Conn. 926, 683 A.2d 22 (1996). Our Supreme Court, however, in *South Windsor* v. *South Windsor Police Union, Local 1480*, 255 Conn. 800, 823–24, 770 A.2d 14 (2001), found that this general notion of the public interest fails to meet the test for the public policy exception to arbitral authority. Having found other well defined public policies on which to ground our decision, we decline to rely on that general consideration.

an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy . . . ." (Internal quotation marks omitted. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 474–75.

When a municipal employee violates the public policies enumerated in state statutes and employment regulations, a reviewing court cannot enforce an arbitral award reinstating him to employment as a police officer. See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 35 (trial court properly determined that arbitrator's award reinstating employee who embezzled from former employer violated public policy); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 478 (finding against public policy award reinstating correction officer who made harassing, racist telephone calls to state legislator while on duty because conduct violated criminal statute and employment regulations of department of correction); *South Windsor* v. *South Windsor Police Union*, 41 Conn. App. 649, 654, 677 A.2d 464 (finding against public policy reinstatement of police officer who deliberately revealed identity of confidential informant), cert. denied, 239 Conn. 926, 683 A.2d 22 (1996); *State* v. *Council 4, AFSCME*, 27 Conn. App. 635, 641, 608 A.2d 718 (1992) (trial court properly determined that arbitra-

tor's award reinstating employee who misappropriated state funds violated public policy).[16]

Here, the arbitrators made factual findings that the defendant engaged in inappropriate behavior, used his position of authority to influence and to intimidate the victims, and made misleading statements during the internal affairs investigation. The defendant's lewd comments and unwanted touching to facilitate sexual interaction with the victims and the sexual assault charge brought by the state regarding one of the victims fit squarely within the behavior proscribed by the legislature. Moreover, the defendant's use of a police cruiser to intimidate and to watch the victims and offers to use his position to influence a prosecutor are directly at odds with the public policy of this state. Accordingly, it is against well defined public policy for a court to enforce an award reinstating the defendant.

Reinstatement of the defendant to the police force is also at odds with well established federal law. Claims of sexual assault by a police officer fall under the purview of the fourteenth amendment; see *Poe* v. *Leonard*, 282 F.3d 123, 136–37 (2d Cir. 2002); and, thus, the city is potentially liable under *Monell* for the defendant's actions and its failure to take remedial steps to prevent a police officer from engaging in harassment and misconduct, particularly when there is a pattern of such inappropriate behavior. "[A]rbitrators exceed their authority if their award orders a party to engage in conduct that is patently illegal or in clear violation of public policy." (Internal quotation marks omitted.) *Hartford* v. *International Assn. of Firefighters, Local 760*, 49 Conn. App. 805, 813, 717 A.2d 258, cert. denied,

---

[16] We do not hold that the violation of a criminal statute is a per se public policy violation sufficient to justify vacating an arbitrator's decision. Instead, we conclude that this case poses a narrow, blatant example of the board's proper exercise of its power to dismiss. See *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477–78.

247 Conn. 920, 722 A.2d 809 (1998). For a court to enforce the award reinstating the defendant would violate federal policies encouraging municipalities to remedy and to prevent constitutional violations by their employees.

The judgment is affirmed.

In this opinion the other judges concurred.