******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CITY OF NEW HAVEN *v.* AFSCME,
## COUNCIL 4, LOCAL 3144
### (SC 20362)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Keller, Js.

*Syllabus*

The plaintiff city sought to vacate an arbitration award reinstating the grievant, J, a member of the defendant union, to her employment as executive director of the city's Commission on Equal Opportunities. In that position, J oversaw construction contract compliance and enforcement of the chapter of the city's code of ordinances that requires building contractors doing business with the city to hire certain percentages of women, minorities and city residents. The union filed a grievance, claiming that the city did not have just cause to terminate J's employment. Thereafter, pursuant to the parties' collective bargaining agreement, the matter proceeded to a hearing before an arbitration panel, which issued an award in which it found that the city had proven only three of the eleven factual claims that it had asserted justified J's termination, specifically, that she failed to comply with a certain request for information during the city's investigation of the relationship between the commission and a certain training and employment program created and funded by the city, which was operated under the auspices of the commission, until it was spun off into a legally separate private entity, that she formed C Co., a private company that advertised contract compliance services in Connecticut, without informing the city, and that she issued four memoranda under her signature soliciting donations for the subject program from contractors in lieu of fines, despite having been warned by the city's corporation counsel office that doing so could expose her, commission staff or the city to potential claims of bribery. The panel concluded that, although J's misconduct was serious in nature, the city was not justified in terminating J's employment. The panel, therefore, ordered that J be reinstated to her position; however, she did not receive two years of back pay and benefits. The city filed an application to vacate the award, claiming that the award violated the clear public policy prohibiting unethical, unlawful and/or illegal conduct by public officials. The union, in turn, filed an application to confirm the award. Following a hearing, the trial court rendered judgment granting the union's application to confirm the award and denying the city's application to vacate the award, from which the city appealed. *Held* that the trial court properly confirmed the arbitration award and correctly determined that the award did not violate public policy, the city having failed to meet its burden of demonstrating that the reinstatement of J's employment violated public policy: although the statutory, regulatory and decisional law of Connecticut evinces an explicit, well-defined and dominant public policy against public corruption in all of its forms, this court's review of the applicable factors governing whether termination of employment is the sole means to vindicate public policy indicated that the arbitration award reinstating J did not violate those public policies, as the record revealed that, with respect to the only relevant findings of misconduct, namely, those related to J's formation of C Co. and her issuing four memoranda under her signature soliciting donations, the provisions of the city's ethics ordinance prohibiting conflicts of interest or the appearance of any such conflicts did not require termination of employment but, rather, permitted the imposition of discipline up to and including removal from office only for certain specified offenses, none of which were implicated in this case, and the city identified no provision of the collective bargaining agreement, employee regulation or city ordinance that requires the termination of employment for employees who disregard the advice of the corporation counsel's office; moreover, although J's employment arguably implicated the public trust, it did not bring her into contact with vulnerable populations or involve public safety or any other essential public service and the city presented no evidence that her employment involved significant fiscal responsibilities,

fiduciary duties, access to financial records or control over public finances, and J's conduct, although serious, was not so egregious that an award reinstating her employment but docking her two years of pay, could not vindicate the relevant public policies and send a powerful message to other municipal employees and the public at large that similar conduct will not be tolerated; furthermore, there was nothing in the record to suggest that J was incorrigible, but, rather, to the contrary, during the nearly twenty years that she worked for the city, J had a spotless employment record and was cited on several occasions for her high ethical standards, and her amenability to discipline was demonstrated by the fact that she did not appeal from the arbitration award, which imposed one of the most severe punishments short of termination ever meted out in an arbitration proceeding conducted pursuant to a collective bargaining agreement; additionally, the city's contention that a public sector employer should not have to countenance conduct by an executive level employee in a fiscally sensitive position that has a negative impact on public accountability and public confidence was unavailing, as it is well established that general notions of public good, public accountability or public trust are insufficient grounds for invoking the extremely narrow public policy exception to judicial enforcement of arbitral awards.

Argued October 13, 2020—officially released March 4, 2021*

*Procedural History*

Application to vacate an arbitration award, brought to the Superior Court in the judicial district of New Haven, where the defendant filed an application to confirm the award; thereafter, the case was tried to the court, *Abrams, J.*; judgment denying the plaintiff's application to vacate and granting the defendant's application to confirm, from which the plaintiff appealed. *Affirmed.*

*Proloy K. Das*, with whom, on the brief, was *Chelsea K. Choi*, for the appellant (plaintiff).

*Kimberly A. Cuneo*, with whom was *J. William Gagne, Jr.*, for the appellee (defendant).

*Opinion*

KELLER, J. The plaintiff, the city of New Haven (city), appeals[1] from the judgment of the trial court granting the application of the defendant, AFSCME, Council 4, Local 3144 (union), to confirm an arbitration award reinstating the grievant, Nichole Jefferson, a member of the union, to her employment as executive director of the city's Commission on Equal Opportunities (commission) and denying the city's corresponding application to vacate the award on public policy grounds. On appeal, the city claims that the trial court incorrectly determined that the award did not violate public policy. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. At all times relevant to this appeal, the city and the union were parties to a collective bargaining agreement that provided for final and binding arbitration of disputes arising under the agreement. Jefferson was employed by the city from March 6, 1996, until her termination on August 5, 2015. During that time, she enjoyed an excellent employment record, won various awards and was promoted five times, the last time, in 2001, to the position of executive director of the commission. The commission is comprised of a nine member board of commissioners (board), eight of whom are appointed by the mayor, with the remaining member chosen by the Board of Aldermen from its number.[2] As executive director of the commission, Jefferson oversaw construction contract compliance[3] and enforcement of chapter 12 1/2 of the New Haven Code of Ordinances, which requires building trade contractors doing business with the city to hire certain percentages of women, minorities and New Haven residents. In addition to its enforcement powers, the commission is responsible for sponsoring educational programs, providing resources and expanding outreach efforts in all segments of society to eliminate discrimination within the city. Although commission staff can recommend fines for violations of chapter 12 1/2, the board has the final say as to whether any such fines will be imposed.[4] As executive director of the commission, Jefferson reported to the board as well as to the city's economic development administrator.

In 2013, the city elected a new mayor, who was sworn in in January, 2014. At the request of the outgoing administration, Jefferson prepared transition documents for the new mayor to familiarize her with the commission, its organizational structure and responsibilities. The documents contained numerous references to the "Construction Workforce Initiative 2" (CWI2), a program created by the city in the early 2000s to provide training and employment opportunities in the construction industry for disadvantaged low to moderate income city residents. CWI2 was funded by the city and operated

under the auspices of the commission until 2011, at which time it was spun off, at the direction of the city, into a legally separate, nonprofit entity.[5] According to the arbitration award, after being "spun off, CWI2 was always intended to be the recipient of city assistance and resources, includ[ing] services provided by . . . city paid employees whose salaries were funded in part from fines and donations received by [the commission] and funds received by CWI2 but turned over to the city . . . ." (Citation omitted.) It was also intended that commission staff would continue to "perform duties for [the commission] and CWI2 simultaneously." (Internal quotation marks omitted.)

Upon review of the transition documents submitted by Jefferson, the new mayor ordered an investigation into the relationship between the commission and CWI2. According to the arbitration award, the city's then corporation counsel, Victor Bolden, retained outside counsel to conduct the investigation. "Over the next few months, the office of corporation counsel reviewed the documents received by [outside counsel], including grant applications [that Jefferson had prepared] on behalf of CWI2, documents produced by the mayoral transition, and the documents provided by . . . Jefferson." (Internal quotation marks omitted.) On March 18, 2015, Matthew Nemerson, the then newly appointed economic development administrator, placed Jefferson on administrative leave. On August 6, 2015, following a *Loudermill* hearing,[6] the city sent Jefferson a letter terminating her employment. The letter stated in relevant part:

"You have violated the [c]ity's [c]ode of [e]thics and abused your power as the [e]xecutive [d]irector of the [commission]. You have engaged in intimidation, attempted bribery and corruption with contractors doing business with the [c]ity of New Haven, namely, Lab Restoration and Construction, [LLC], John Moriarty and Associates, Inc., and Tri-Con Construction Managers, LLC.

"You used [c]ity time and resources to create and operate a separate entity, [Career Compliance Placement, LLC (CCP)]. At no time did you disclose that you created such an entity.

"You operated a private entity, [CWI2], and through misrepresentations used the [c]ity to further benefit your private entity.[7] You even sought donations for your private entity from the contractors whose employment practices you were entrusted to enforce [while] affiliating yourself with the [c]ity despite being warned not to do so. You also misrepresented to the [s]tate when applying for grant funds [for] your private entity.

"You failed to cooperate with this investigation while on paid leave. You failed to comply with . . . Nemerson's May 13, 2015 requests for information highly perti-

nent to this investigation. You failed to attend investigatory meetings in connection with this report. You failed to cooperate in the June 9, 2015 investigatory interview as clearly set forth in the audio of that interview." (Footnote added.)

On August 6, 2015, the union filed a timely grievance, claiming that the city did not have just cause to terminate Jefferson. After exhausting internal grievance procedures, the union invoked its contractual right to submit the matter to the state Board of Mediation and Arbitration for arbitration before a panel of three arbitrators (panel). In its brief to the panel, the union argued, inter alia, that the city had "justified its investigation of . . . Jefferson upon an obvious fallacy and pretext," namely, "the [need for] an investigation into the relationship between . . . Jefferson, the [commission] and CWI2" and that "[n]o such investigation was ever justified because the [c]ity had . . . [itself] created, fostered and maintained the relationship between CWI2 and the [c]ity." The union further argued that the city's claims that Jefferson engaged in acts of intimidation, attempted bribery and corruption toward various contractors were wholly unfounded. Finally, the union asserted that Jefferson had formed CCP "with the expressed permission of the [c]ity's [d]eputy [c]orporation [c]ounsel, John Ward, in 2008" and annually disclosed her consulting work to the city's labor relations and human resources offices.

Following eighteen days of hearings, the parties submitted the following unrestricted submission to the panel: "Did the [city] have just cause to terminate . . . Jefferson's employment on August 6, 2015? If not, what shall the remedy be?" On March 27, 2018, the panel issued a thirty-seven page decision in which a majority of the panel found that the city had proven only three of the eleven factual claims[8] that it had argued justified Jefferson's termination. Specifically, the panel found that the city had proven that, although Jefferson had "received city authorization to provide consulting services" in New York, she "did not receive authorization, nor did she disclose that she [had] formed [CCP], a Connecticut LLC that advertise[s] contract [compliance] services, which could . . . lead to the appearance of impropriety and a conflict of interest as defined and argued by the city . . . ."[9] (Internal quotation marks omitted.) The panel found that "the [city's] ethics ordinance establishes standards of conduct that require city employees to 'be impartial and responsive to the public interest' without regard 'to personal gain or advantage.' And, as argued by the city, the advertising of contract compliance service in . . . Connecticut represents a conflict of interest as defined by the city's ethics ordinance." The panel further found, however, that "there [was] no evidence" that Jefferson ever provided any such services in Connecticut or ever intended to deceive the city about CCP's existence, which, the

panel added, "was a matter of public record." According to the arbitration award, "Jefferson testified that she formed CCP . . . as a limited liability company [in Connecticut] because she had to form [the company] in . . . the state where [she] live[d] and that she could not perform consulting . . . in New York as Nichole Jefferson because 'you [have] to be a company.' " She further testified that, in January, 2008, she e-mailed Ward requesting permission to perform "consultation work for [national builder and developer] Gilbane [Inc.] . . . in . . . New York" and was told by him "that her consultancy with Gilbane [Inc.] was acceptable provided it . . . was not in . . . Connecticut." (Internal quotation marks omitted.)

The panel also found that the city had proven that, while on administrative leave, Jefferson had "fail[ed] to comply with . . . Nemerson's May 13, 2015 request for information," and, therefore, she "did not cooperate with the investigation," as required by the collective bargaining agreement. The panel further found, however, as a "mitigating circumstance," that Jefferson had followed the union's advice with respect to this request.

Finally, the panel found that the city had proven that, in 2008, "Jefferson, by means of issuing four letters under her signature, sought donations for CWI2 from the contractors whose employment practices [she] was entrusted to enforce . . . despite being warned not to do so." (Internal quotation marks omitted.) The evidence presented to the panel established that, on or about June 6, 2005, Jefferson requested and received permission from the city's Board of Aldermen "to accept outside funds, gifts, and bequests from public or private sources" to be used "to enhance the resident manpower and training programs sponsored by the city . . . [through CWI2]."[10] Subsequently, in late 2005, Jefferson asked the corporation counsel's office "if [the commission] could collect charitable donations from contractors in lieu of penalties for noncompliance with [chapter] 12 1/2." After researching the issue, Kathleen Foster, the city's then deputy corporation counsel, issued a memorandum on February 23, 2006, in which she stated in relevant part: "In the absence of . . . specific [legal] authority . . . [providing] that [the commission] . . . may arrange for charitable contributions in lieu of penalties, we believe that any such action could expose the commission, the [c]ity and/or any individual involved to civil claims and potential criminal charges for bribery or solicitation of bribery, notwithstanding their lack of criminal intent. I urge [the commission's] enforcement counsel, Attorney [Evans] Jacobs, to examine this issue carefully in the context of any pending disputes. [The commission's] ability to lawfully accept gifts or contributions to fulfill its purposes is a separate legal issue from whatever considerations or actions it may make to resolve violations of [c]hapter 12 1/2. Acceptance of gifts or contributions,

again, would require the approval of the [city's] Board of Aldermen."

According to the arbitration award, in connection with this claim, the city also presented "an August 14, 2008 [m]emorandum of [u]nderstanding [(memorandum)] . . . as well as three additional [memoranda] issued on or about September 30, 2008, and November 13, 2008, all stating that noncompliance issues could be resolved with donations to the Career Development School [(school)], a CWI2 program, in lieu of the fines authorized by the . . . [c]ommission. . . . [E]ach of the [memoranda] . . . were under . . . Jefferson's signature and did not contain a notation copying other individuals." (Citation omitted; internal quotation marks omitted.) One such memorandum stated in relevant part: "Barret[t], Inc., and their associates Zeldes, Needle and Cooper, [P.C.], shall make donation[s] [i]n the amount of ($10,000.00) ten thousand and ([$]5,000.00) . . . five thousand dollars respectively to the [school]; Barrett, [Inc.], further agrees to remove all unauthorized workers, if any, from the Eastview Terrace Construction site. Satisfying these two stipulations will bring Barrett, [Inc.], into full compliance in relation to this project." The memorandum further stated that it was subject to ratification by the board and that "Jefferson, as the [e]xecutive [d]irector, recommended ratification by the [board]." In its brief to the panel, the city argued that the memoranda established that "Jefferson was . . . soliciting donations from contractors while she was carrying [out] her enforcement duties for [the commission] in defiance of the direct advice from [the] [c]orporation [counsel's] office." According to the city, although it was perfectly proper for Jefferson to solicit donations from the contractors—indeed, under chapter 12 1/2, article I, § 12 1/2-5, of the New Haven Code of Ordinances; see footnote 10 of this opinion; it was her "duty" to do so—it was improper for her to solicit them in lieu of fines.

Before the panel, the union argued that "Foster's letter on charitable contributions . . . did not forbid donations but instead stated that such donations could be solicited only with Board of Aldermen approval," and that the Board of Alderman had "passed such an order expressly authorizing donations . . . [and] thereafter adopted budgets expressly accounting for the potential of such donations . . . ." (Citation omitted.) In siding with the city on this issue, the panel rejected the union's interpretation of Foster's letter, concluding, instead, that the letter made clear that whether the commission could accept donations and whether it could accept donations *in lieu of fines* were two separate issues. The panel noted, however, that "there is no evidence as to what eventuated from the [memoranda in question]. Nevertheless, the [memoranda] appear to clearly amount to an attempt to solicit donations in lieu of fines which [as the city argued]

'could expose [the city and/or individual employees] to charges of bribery or solicitation of bribery.' . . . And, as the [memoranda] appeared under . . . Jefferson's signature, a majority of the panel conclude[d] that . . . Jefferson, as with the case of most [e]xecutive [d]irectors, and absent other evidence regarding the background of the [memoranda in] question, bears . . . responsibility for them." (Citation omitted.)

The panel next considered Jefferson's employment record with the city, noting the numerous awards and citations she had received throughout her career, as well as several positive performance evaluations rating her "[e]xcellent" in the category of "[e]thics and [g]overnment" and describing her as exhibiting " 'strong ethical behavior' " in her work. In light of these and other findings, the panel concluded that the city was not justified in terminating Jefferson's employment. Specifically, the panel stated: "It is said to be axiomatic that the degree of penalty shall be in keeping with the seriousness of the offense. . . . [After] [t]horough consideration [of the] seriousness of the proven offenses . . . the panel concluded that, though those offenses are of a serious nature, they are not individually or cumulatively extreme to the point of justifying termination from employment. . . .

"The panel has devoted thorough consideration to all of the available documentary and testimonial evidence that has been presented by the parties. The panel has also thoroughly considered the nature and the seriousness of the offenses that the city has identified, and met the burden of [proving], and . . . has weighed [the] same in light of . . . Jefferson's employment record, and length of service. . . . Accordingly, a majority of the panel has concluded . . . [that] Jefferson shall be reinstated to the position of executive director of the [commission], and the city shall restore back pay, minus interim earnings, and . . . Jefferson shall otherwise be made whole of contractual benefits for the period starting on August 1, 2017, through [the] date of reinstatement. In the event that . . . Jefferson has . . . receive[d] state unemployment compensation [during] the stipulated period, that compensation shall not be deducted." (Citations omitted; internal quotation marks omitted.) Thus, pursuant to the award, Jefferson did not receive back pay and benefits for the two year period beginning on August 5, 2015, the date of her termination, and ending on August 1, 2017.

On April 25, 2018, the city, pursuant to General Statutes § 52-418, filed a timely application to vacate the arbitration award, claiming that the award violated the clearly defined and dominant public policy prohibiting "unethical, unlawful and/or illegal conduct" by public officials, as set forth in chapter 12 5/8 of the New Haven Code of Ordinances,[11] the city's ethics ordinance; the Connecticut Code of Ethics for Public Officials, General

Statutes § 1-79 et seq.; and General Statutes §§ 53a-148[12] and 53a-161,[13] which govern the solicitation or receipt of bribes by public officials and employees. On October 4, 2018, the union, pursuant to General Statutes § 52-417, filed an application to confirm the award, which the city opposed for the reasons set forth in its application to vacate the award.

Following a hearing, the trial court issued an order granting the union's application to confirm the award and denying the city's corresponding application to vacate. The trial court's order stated in relevant part: "While the city identifies a number of issues with the award, the only issue that it deals with in detail is its claim that the award violated public policy. In such cases, the court must first determine whether the award does, indeed, implicate an explicit, well-defined and dominant public policy, and, if so, then the court must determine whether the award violates that policy." Although the court agreed with the city that the issues addressed in the award raised "strong public policy concerns," it disagreed that the only way to vindicate those concerns was for the city to terminate Jefferson's employment.

In reaching its decision, the trial court noted that, in *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 114 A.3d 144 (2015), this court identified four factors (*Burr* factors) courts should consider in determining whether termination of employment is the sole means to vindicate an important public policy: "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." Id., 634. Without specifically addressing all of the *Burr* factors,[14] the trial court concluded that "the violation of public policy at issue in this case does not mandate termination . . . ." Specifically, the trial court stated: "While the court finds that there was actual harm sufficient to consider the behavior at issue egregious," there was "insufficient support for the argument that . . . Jefferson would not respond appropriately to progressive workplace discipline, and, as a result, [the court] cannot find her 'incorrigible.' "

On appeal, the city contends that the trial court incorrectly determined that Jefferson's reinstatement did not violate public policy merely because there is no evidence that Jefferson is incorrigible. The city argues, inter alia, that the trial court's decision is untenable in light of the city's claim that the conduct that led to Jefferson's termination violated and implicated state and local ethics laws and criminal statutes. The city further argues that a public sector employer should not

be required to prove that an employee "who held a fiscally sensitive position of public trust and engaged in egregious conduct" that included "acts of intimidation, attempted bribery, corruption, and misuse of city time and resources," will not reoffend before it may terminate that employee. The city contends that the four factor test set forth in *Burr Road Operating Co. II, LLC,* does not adequately address a public sector employer's need to maintain and promote public accountability and that, in cases involving public sector employers, courts "should consider the impact on public accountability or public confidence as a factor in its own right . . . ."

The union responds, inter alia, that the trial court correctly determined that termination of Jefferson's employment was not required to vindicate the public polices at issue. The union contends that the city, in arguing to the contrary, incorrectly states that the trial court "found" that Jefferson had violated various state and local laws, when, in fact, the court merely observed that "the issues raised implicate strong public policy concerns." Indeed, the union argues that the city, in its brief to this court, "takes its own argument and makes it seem as if [the trial court agreed with it]," when, in fact, the trial court expressed no such agreement. The union also asserts that the city's brief is replete with factual assertions, including that Jefferson engaged in "acts of intimidation, attempted bribery, corruption, and misuse of city time and resources," that completely disregard the actual findings of the arbitration panel, which were to the contrary. We agree with the union.

At the outset, we set forth the standard of review. "When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Accordingly, the factual findings of the arbitrator . . . are not subject to judicial review. (Citation omitted; internal quotation marks omitted.) *Norwalk Police Union, Local 1727, Council 15, AFSCME, AFL-CIO* v. *Norwalk*, 324 Conn. 618, 628, 153 A.3d 1280 (2017). "[I]n applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings. . . .

"We have recognized, however, that an arbitration award should be vacated when, inter alia, it violates

clear public policy. . . . When a challenge to a consensual arbitration award raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review.[15] . . .

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. . . . A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [a collective bargaining agreement] is limited to situations where the contract as interpreted would violate some explicit public policy that is [well-defined] and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . .

"The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . [G]iven the narrow scope of the public policy limitation on arbitral authority, the trial court's order [confirming] the arbitrator's award should be [reversed] only if the plaintiff demonstrates that the . . . award clearly violate[d] an established public policy mandate. . . . As we repeatedly have emphasized, implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Citations omitted; footnote altered; internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 721–22, 142 A.3d 1122 (2016).

Consistent with the foregoing law, the sole issue before us is whether the panel's award reinstating Jefferson to employment violates public policy. "This court employs a two-pronged analysis to determine whether an arbitration award should be vacated for violating public policy. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated [that] policy." (Internal quotation marks omitted.) Id., 723.

In the present case, the city argues that the dominant public policies implicated in this appeal are set forth in the bribery statutes applicable to public servants and

employees; see footnotes 12 and 13 of this opinion; and in the city's ethics ordinance, particularly the provisions requiring city employees to avoid conflicts of interest, impropriety or the appearance of impropriety. See footnote 11 of this opinion. We agree with the city that the statutory, regulatory and decisional law of Connecticut evinces an explicit and well-defined public policy against public corruption in all of its forms; see, e.g., *Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 462, 87 A.3d 1078 (2014) ("[g]overnment corruption breeds cynicism and mistrust of elected officials . . . [and] has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials" [internal quotation marks omitted]); and in favor of imposing strong ethical standards on government officials. See, e.g., General Statutes § 1-79 et seq. (establishing code of ethics for state public officials); General Statutes § 7-148h (authorizing establishment of municipal ethics commissions). Because the existence of these important public policies is not in dispute, we turn to the question of whether the panel's award violated them.

In making this determination, we are mindful that "the fact that an employee's misconduct implicates public policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct. As the United States Supreme Court has held, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 41, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987). . . . [Thus] [t]he arbitrator has the authority to choose the appropriate form of discipline even when the employee misconduct implicates public policy." (Citation omitted; internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 532, 69 A.3d 927 (2013); see also *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 739 (emphasizing that "public policy based, judicial second-guessing of arbitral awards reinstating employees is very uncommon and is reserved for extraordinary circumstances"). "The party seeking to vacate an award reinstating a terminated employee bears the burden of proving that nothing less than . . . termination of . . . employment will suffice given the public policy at issue." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 725.

As previously indicated, this court has identified four factors "a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy . . . . [They are]: (1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3)

the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." (Citation omitted; internal quotation marks omitted.) Id., 725–26.

"The first factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634–35.

In considering this factor, we note that Jefferson was found to have engaged in three types of misconduct: (1) failing to respond to Nemerson's May 13, 2015 request for information, (2) forming CCP, a private company that advertised contract compliance services in Connecticut, without informing the city that she had done so, and (3) "by means of issuing four [memoranda] under her signature, '[seeking] donations for CWI2 from the contractors whose employment practices [she] was entrusted to enforce . . . .' " Because the city does not argue that the first finding implicates the type of dominant and well-defined policy that the public policy exception is intended to vindicate, we confine our analysis to the latter two findings.

With respect to Jefferson's formation of CCP, the city argues that this act violated provisions of the city's ethics ordinance prohibiting conflicts of interest or the appearance of any such conflicts. A review of the city's ethics ordinance reveals, however, that it does not require termination of employment for the conduct at issue but, rather, permits "an appropriate authority to impose discipline" up to and including removal from office only for certain specified offenses, none of which is implicated in this appeal.[16] New Haven Code of Ordinances, c. 12 5/8, § 12 5/8-8 (i); see *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 726–27 (public policy did not mandate termination of state employee who had been caught smoking marijuana at work because relevant state regulations and drug-free workplace policy provided that state employees may be disciplined short of termination for use of illegal drugs while on duty); *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 136–37, 140, 855 A.2d 964 (2004) (public policy did not mandate termination of state employee who deliberately shoved client into chair, causing him injury).

With respect to the panel's finding that Jefferson attempted to solicit donations in lieu of fines, which the city argues could have exposed the city or commission staff to charges of bribery or solicitation of bribery, we conclude that the strong public policy against the solicitation or acceptance of bribes by public officials would be violated by any discipline short of termination if the panel had found that Jefferson had solicited or accepted a bribe. See, e.g., *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 46–47, 757 A.2d 501 (2000) (reinstatement of municipal employee convicted of embezzling money from employer "violated the clear public policy against embezzlement, [which] encompasses the policy that an employer may not be required to reinstate the employment of one who has been convicted of embezzlement of his employer's funds"). As the union contends, however, the panel made no such finding. Indeed, the panel rejected the city's only claim alleging that Jefferson solicited a bribe (as opposed to a donation in lieu of a fine), concluding that the evidence simply did not support it.[17] We are bound by that factual determination. See, e.g., *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 298 Conn. 824, 837, 6 A.3d 1142 (2010) (in determining whether arbitration award violated public policy, reviewing court was bound by arbitration panel's factual findings regarding nature of employee's misconduct); see also *C. R. Klewin Northeast, LLC* v. *Bridgeport*, 282 Conn. 54, 97, 919 A.2d 1002 (2007) ("even if [we] . . . were to assume . . . that there exists an explicit, well-defined, and dominant public policy against enforcing illegally procured contracts, [we] would defer to the arbitrator's factual findings under this court's standard of review of the narrow public policy exception . . . that the contract [at issue] was not illegally procured" (internal quotation marks omitted)).

Rather, the panel found that, because they "appeared under [her] signature," Jefferson "[bore] . . . responsibility" for four memoranda written in 2008 that "appear to clearly amount to an attempt to solicit donations in lieu of fines," despite having been warned by Foster, the deputy corporation counsel, that doing so "could expose the [commission], the city and/or any individual involved to civil claims and potential criminal charges for bribery or solicitation of bribery, notwithstanding their lack of criminal intent." In other words, the panel found that Jefferson ignored Foster's legal advice and, in doing so, could have exposed herself, her staff or the city to potential claims of bribery—meritorious or not—a serious disciplinary matter perhaps, but one clearly governed by the disciplinary procedures outlined in the parties' collective bargaining agreement, not the state's bribery statutes. The city has identified no provision of that agreement or an employee regulation or ordinance that requires termination of employment for employees who disregard the advice of the

corporation counsel's office.[18] As previously indicated, the panel also found that there was no evidence that the memoranda actually resulted in the receipt of donations to CWI2 in lieu of fines. In light of the foregoing, we conclude that the first *Burr* factor does not support vacating the panel's award.

The second factor we consider is "whether the nature of the employment at issue implicates public safety or the public trust." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 635. As we previously have explained, "in the vast majority of cases in which courts have vacated for public policy reasons arbitration awards reinstating terminated employees, the grievant has been a public sector employee, primarily working in fields such as law enforcement, education, transportation, and health care, in other words, fields that cater to vulnerable populations or help ensure the public safety. . . . This reflects the fact that the threat to public policy involved in reinstating a terminated employee is magnified when the offending employee provides an essential public service, and especially when he is employed by, represents, and, ultimately, is answerable to the people." (Citations omitted.) Id., 635–36. "This factor . . . hinges on general questions of law and policy and is, therefore, subject to plenary judicial review." Id., 637.

It is undisputed that Jefferson's employment did not bring her into contact with vulnerable populations or involve public safety or any other essential public service. The city argues, nonetheless, that the second factor is satisfied because "[Jefferson's] reinstatement . . . put her back into [a position that] involves policy making, significant fiscal responsibility, fiduciary responsibilities, and access to financial records," all of which "[implicate] the public trust." The union responds, and we agree, that the city presented no evidence that Jefferson's job involved significant fiscal responsibility, fiduciary duties, access to financial records or control over public finances. Although Jefferson's enforcement duties included recommending to the board whether to impose fines for violations of chapter 12 1/2, it is undisputed that the board had the ultimate decision-making authority over whether to impose any such fines. Nevertheless, there was testimony that, "if a [commission] staff [member] and a contractor made arrangements to do so, fines could be dropped prior to the [board's] vote." Thus, Jefferson's job arguably implicated the public trust to the extent it authorized her to negotiate with noncompliant building contractors and to excuse violations of the city's equal opportunity laws. Taking into account all of these facts, we conclude that the second *Burr* factor does not weigh in favor of or against vacating the award but is, instead, neutral.

We next consider the third *Burr* factor, namely, "whether the grievant's conduct was so egregious that no disciplinary measure short of termination will vindicate the relevant public policies." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 645. "This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. . . .

"This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. . . . We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue. . . . [F]or purposes of the public policy analysis, [however] our determination of whether the conduct in question was so egregious that any punishment short of termination would offend public policy is not restricted to those findings. . . . A broader review is required because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on case specific considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee. . . . Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted.) Id., 638–39.

Upon consideration of these myriad factors, and bearing in mind the parties' arguments with respect thereto, we agree with the panel that Jefferson's acts, though serious, were not so egregious that an award reinstating her employment but not making her whole, essentially docking her two years of pay,[19] could not vindicate the public policies at issue and send a powerful message to other municipal employees and the public at large

that similar conduct will not be tolerated. Indeed, the city has not cited a single case from Connecticut—or any other jurisdiction for that matter—in which a court, in applying the public policy exception, concluded that termination of employment was the sole, acceptable punishment for similar conduct. Nor has our independent research revealed any such case. The only case cited by the city, *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 46–47, is readily distinguishable because it involved reinstatement of a municipal employee who was convicted of embezzling funds from his employer, a far cry from the conduct at issue in the present case.[20]

The panel found that Jefferson (1) disregarded Foster's advice not to solicit donations in lieu of fines from companies whose labor and employment practices she oversaw, and (2) formed a private company that ran afoul of the city's conflict of interest laws. The panel also found, however, that the city authorized Jefferson to solicit donations from the companies she oversaw[21] and even allowed her to perform consulting work for one of them, Gilbane, Inc., in New York.[22] Thus, the city is hardly blameless in this matter. Indeed, it is evident that the city's own policies and decision making at critical junctures created for Jefferson an ethical tightrope that could only end in the ethical lapses and errors of judgment of which the city now complains.

As for Jefferson's specific acts of misconduct, although the panel found that Jefferson failed to seek authorization from the city to form CCP, it also found in mitigation that CCP never provided any consulting services in the state and that Jefferson never sought to hide the company from the city. As previously indicated, Jefferson testified that she formed CCP for liability reasons after the city granted her permission to provide consulting services in New York and that she registered it in Connecticut because she thought that she was required to register it in the state where she lived.

As for the panel's finding that Jefferson, as executive director of the commission, "[bore] . . . responsibility" for four memoranda issued "under [her] signature" in 2008, in which the commission agreed to accept donations to CWI2 in lieu of the payment of fines, the panel also found that there was no evidence as to what eventuated from the memoranda in question, which, by their express terms, had to be approved by the board. We note, moreover, as the union argues, that the city presented no evidence that Jefferson personally benefited in any way from her fundraising efforts for CWI2, which, in 2008, was a city program operated under the auspices of the commission.[23] Nor was there any evidence that the fines discussed in the memoranda were not actually owed by the contractors or were in any way improper. Furthermore, according to the testimony of Attorney Clifton Graves, a member of the board during the rele-

vant time period, "when fines [were] collected, they were put into the [commission] fund," which "was a fund that was set up primarily to run programs and to assist the [commission] in achieving its goals." Because CWI2 was itself a city program operated by the commission, and because the memoranda merely allowed the contractors to donate to CWI2 directly in lieu of paying fines into the commission's general fund, it is difficult to discern the basis for the city's contention that the memoranda exposed the city and commission staff to "potential criminal charges for bribery or solicitation of bribery . . . ." We need not resolve this question, however, to conclude that the third *Burr* factor weighs against the conclusion that the panel's award violates public policy.

The fourth *Burr* factor requires us to consider "whether the grievant is so incorrigible as to require termination. . . . Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court uphold the arbitration award of reinstatement, this particular employee will reengage in the offending conduct? . . . Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from additional training and guidance. . . . We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. . . .

"Because these considerations are largely fact based and case specific, a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . [In the absence of] an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Citations omitted; internal quotation marks omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 639–40.

Although the panel made no express finding regarding Jefferson's incorrigibility, the city concedes that there is nothing in the record to suggest that she is incorrigible. To the contrary, the panel found that, during the nearly twenty years that she worked for the city, Jefferson enjoyed a spotless employment record and was cited on several occasions for her high ethical standards. As for Jefferson's amenability to discipline,

we note that she did not appeal the panel's decision not to award her back pay and benefits for two of the three years that she was out of work as a result of her termination and the parties' lengthy arbitration, which, as the city acknowledged during oral argument before this court, ranks as one of the most severe punishments short of termination ever meted out in an arbitration proceeding conducted pursuant to a collective bargaining agreement.

The city argues, however, that incorrigibility or "a likelihood to reoffend should not be a dispositive factor . . . in reviewing the termination of a public employee who commits egregious acts that violate public trust and confidence." We disagree that it is a dispositive factor. Although it may have figured prominently in the trial court's analysis, the weight a reviewing court attaches to it—or to any *Burr* factor—necessarily depends on the facts of the case. Undoubtedly, there will be cases in which an employee's misconduct is so egregious that even an exemplary employment history will have no bearing on the outcome. See, e.g., *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 468–69, 478 (reinstatement of correction officer convicted of harassment in second degree after using work phone to place obscene, racist telephone call to state senator violated public policy); *State* v. *Council 4, AFSCME*, 27 Conn. App. 635, 636, 641, 608 A.2d 718 (1992) (reinstatement of employee who admitted to misusing state funds by cashing falsely generated public assistance checks violated public policy). This is not such a case.

The city contends, nonetheless, that a public sector employer should not have to countenance conduct by an executive level employee in a "fiscally sensitive position" that "has a negative impact on public accountability and public confidence." The city asserts that, "[a]side from [her] fiscally sensitive misconduct, [Jefferson also] failed to cooperate with an investigation while on administrative leave," which "[n]o public employer should be expected to treat . . . as not constituting good cause to dismiss an employee." We disagree.

"When a reviewing court is applying the public policy exception, considerations of . . . what . . . an employer *should* be able to do . . . do not in any manner constitute public policy and are thus not relevant to our inquiry. A reviewing court's only inquiry is whether the arbitration award . . . violates a clearly established public policy." (Emphasis added; internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 531. It is well established that general notions of the public good, public accountability or the public trust are insufficient grounds for invoking the extremely narrow public policy exception to judicial enforcement of arbitral awards. See, e.g., *State* v. *New England Health Care Employees Union*,

*District 1199, AFL-CIO*, supra, 271 Conn. 135–36 ("the public policy exception to arbitral authority [must] be narrowly construed and [a] court's refusal to enforce an [arbitration award] is limited to situations where the contract as interpreted would violate some explicit public policy that is [well-defined] and dominant, and is to be ascertained by reference to the laws and legal precedents and *not from general considerations of supposed public interests*" (emphasis added; internal quotation marks omitted)); *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, 255 Conn. 800, 824, 770 A.2d 14 (2001) ("the public policy requiring the confidence of the public in its police force with respect to matters of public safety" is "[a] general consideration [that] fails to meet the test [for] the public policy exception to arbitral authority" (internal quotation marks omitted)); *Board of Police Commissioners* v. *Stanley*, 92 Conn. App. 723, 740 n.15, 887 A.2d 394 (2005) (citing cases and explaining that "general notion of the public interest fails to meet the test for the public policy exception to arbitral authority").

We note, finally, that, in *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 713, we rejected a claim that the public policy exception should be construed more broadly to allow employers to dismiss their employees for a wider range of misconduct, and our reasons for doing so are fully applicable to the present case: "Our general deference to an experienced arbitrator's determinations regarding just cause and the appropriate remedy is vital to preserve the effectiveness of an important and efficient forum for the resolution of employment disputes. If an employer wishes to preserve the right to discharge employees guilty of misconduct such as that at issue in this case, thereby removing the matter from an arbitrator's purview, it remains free to negotiate for the inclusion of an appropriate provision in the collective bargaining agreement that would achieve that result." Id., 739–40. Until such time, however, the employer must abide by the arbitrators' determinations regarding just cause and the appropriate remedy for that conduct.

In light of the foregoing, we conclude that the city has failed to meet its burden of demonstrating that Jefferson's reinstatement violated public policy.

The judgment is affirmed.

In this opinion the other justices concurred.

* March 4, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The city appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] Chapter 12 1/2, article I, § 12 1/2-3, of the New Haven Code of Ordinances, which established the commission, provides in relevant part: "There is hereby created a commission on equal opportunities . . . which shall consist of nine . . . members, each of whom shall reside in New Haven . . . [and] shall serve without compensation. Eight . . . members shall be appointed by the mayor, and one . . . member shall be elected by the board

of aldermen from its number. One . . . member shall be designated by the mayor as chairperson. . . . The commission may adopt such rules and regulations, including rules of practice, as it deems necessary to effectuate the purposes and provisions of this chapter. These rules and regulations shall be subject to approval of the board of aldermen."

Chapter 12 1/2, article I, § 12 1/2-5, delineates the powers and duties of the nine board members, which include "(f) [t]o receive, initiate, investigate and mediate discriminatory practice complaints" and "(k) [t]o appoint an executive director and a legal counsel and such other staff and consultants as are necessary for the commission to carry out its responsibilities under this chapter."

[3] Chapter 12 1/2, article II, § 12 1/2-20 (a) (1), of the New Haven Code of Ordinances establishes "a contract compliance office, headed by a contract compliance director." Chapter 12 1/2, article II, § 12 /12-20, (a) (2) specifies that the "contract compliance director shall be subject to the supervision of the executive director of the commission . . . ."

[4] According to the arbitration award, during the relevant time period, "[i]f a contractor was not in compliance, [commission] staff [were] authorized to issue a letter advising a contractor about his or her failure to comply with federal or state regulations . . . and . . . the fines/penalties incurred as a result. . . . If it was determined that a contractor was not in compliance, and a fine was to be imposed, the [board] had to vote to impose the fine and to accept any [money] tendered to satisfy the fine. . . . Former . . . Commissioner Harvey Fineberg, a union witness, testified that, if a [commission] staff [member] and a contractor made arrangements to do so, fines could be dropped prior to the [board's] vote." (Citations omitted; internal quotation marks omitted.)

[5] Chapter 12 1/2, article II, § 12 1/2-24 (c), of the New Haven Code of Ordinances required contractors doing business with the city to "utilize city sponsored recruitment and training programs to the most feasible extent in order to ensure the hiring of qualifiable minority, women and physically disabled employees, trainees and apprentices." According to the arbitration panel's findings, "[i]t is undisputed that CWI2 was the only city sponsored recruitment and training program" during the relevant time period.

[6] "[A] tenured public employee is entitled to oral or written notice of the charges against him [or her], an explanation of the employer's evidence, and an opportunity to present his [or her] side of the story before termination. . . . The opportunity to present one's side of the story is generally referred to as a *Loudermill* hearing." (Citation omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 243 n.3, 117 A.3d 470 (2015); see also *Board of Education* v. *Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

[7] At all times relevant to this appeal, CWI2 was a city operated and funded recruitment and training program. As previously indicated, it was spun off into a private, nonprofit entity in 2011. Even then, however, it relied heavily on the city for a variety of support. It was never Jefferson's "private entity," as alleged by the city in Jefferson's termination letter.

[8] The eight claims that the panel found were not proven are: (1) in 2004, Jefferson solicited a $15,000 bribe from Artnel Banton, the owner of Lab Restoration and Construction, LLC; (2) on May 24, 2014, Jefferson threatened Brack Poitier, owner of Tri-Con Construction Managers, LLC, during a telephone call; (3) Jefferson incorrectly cited article VI, § 6.2 (A) (10), of a development and land disposition agreement for the development of property located at 100 College Street in New Haven as authority for imposing fines on John Moriarty & Associates, Inc.; (4) Jefferson used city time and resources to create and operate CCP, a private entity that advertised contract compliance services in Connecticut; (5) Jefferson operated a private entity, CWI2, "and through misrepresentations used the city to further benefit [that] entity"; (6) Jefferson "misrepresented to the state when applying for grant funds that [CWI2] was affiliated with the city"; (7) Jefferson failed to cooperate at a June 9, 2015 investigatory meeting; and (8) Jefferson failed to attend investigatory meetings convened in connection with the investigation.

[9] According to the arbitration award, "the CCP website advertise[d] CCP as a woman owned minority business enterprise . . . with a Connecticut office located at 3000 Whitney Avenue, Hamden, CT. . . . The website also advertise[d] that CCP offers a mixed contract compliance inspection service and . . . that its staff has worked primarily in New Syracuse, NY, and New Haven, CT. . . . The city contend[ed] that the cumulative effect of these representations [was] that CCP . . . provide[d] contract compliance services in . . . Connecticut. . . . The city further argue[d] that inasmuch as

CCP . . . used [Connecticut counsel] as an agent for service for CCP . . . Jefferson could have formed CCP . . . in New York . . . designating an agent for service in [that] state to avoid a perceived or actual [conflict] with [the commission]." (Citations omitted.)

[10] Chapter 12 1/2, article I, § 12 1/2-5, of the New Haven Code of Ordinances provides in relevant part: "The commission shall have the power and duty . . . (*l*) [u]pon the approval of the mayor and the board of aldermen, to accept outside funds, gifts or bequests, public or private, to help finance its activities under this chapter. . . ."

[11] In particular, the city relied on chapter 12 5/8, § 12 5/8-5 (e), of the New Haven Code of Ordinances, which provides that "[a] public official or municipal employee has a conflict of interest if he makes or participates in the making of any governmental decision or the taking of any governmental action with respect to any matter in which he has any economic interest distinguishable from that of the general public," and on chapter 12 5/8, § 12 5/8-5 (a), of the New Haven Code of Ordinances, which provides that "[a] public official or municipal employee has a conflict of interest if he or she has, or has reason to believe or expect that they or a member of their immediate family or household, or a business or other organization with which or whom they are employed or with which or whom they are associated with, will or may derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of the official's or employee's official activity or position."

[12] General Statutes § 53a-148 provides in relevant part: "(a) A public servant or a person selected to be a public servant is guilty of bribe receiving if he solicits, accepts or agrees to accept from another person any benefit for, because of, or as consideration for his decision, opinion, recommendation or vote. . . ."

[13] General Statutes § 53a-161 provides in relevant part: "(a) An employee, agent or fiduciary is guilty of receiving a commercial bribe when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. . . ."

[14] The trial court did not address the first or second *Burr* factor.

[15] Accordingly, we reject the city's repeated assertion, in its brief and in oral argument before this court, that the sole issue before the court is whether the trial court correctly determined that, although the city satisfied the first three *Burr* factors, including proving that Jefferson's conduct was egregious, it did not prove that Jefferson was incorrigible, and, therefore, it did not prove that the award violates public policy. As previously indicated, the trial court did not specifically address each of the *Burr* factors, but even if it had, this court is not bound by that court's determinations with respect thereto but, rather, as we have explained, applies de novo review to the question of whether an arbitration award violates public policy.

[16] Chapter 12 5/8, § 12 5/8-8, of the New Haven Code of Ordinances, titled "Prohibited practices; removal from office," provides in relevant part: "In addition to those practices enumerated in the City Charter, section 190 (b) and section 211 (b) of Article XXXVII, which concern removal from office, the following shall be considered cause for removal from office:

"(a) The deliberating, testifying or voting by a member of a board or commission or task force on any matter before said board, or commission, or task force, or any of its committees, which matter requires [or] involves a disclosure of interest on the part of by said member pursuant to section 210 of Article XXXVII of the City Charter or 12 5/8-7 . . . .

"(b) No public official or municipal employee shall request, use, or permit the use of, any consideration, treatment, advantage, benefit, or favor beyond that which it is the general practice to grant or make available to the public at large.

"(c) No public official or municipal employee shall request, use, or permit the use of any publicly owned or supported property, vehicle, equipment, material, labor or service for the personal convenience or the private advantage of himself or any other person, beyond that which is the general practice to grant or make available to the public at large.

"(d) That rule shall not be deemed to prohibit a public official or municipal employee from requesting, using, or permitting the use of such publicly owned or supported property, vehicle, equipment, material, labor, or service that it is the general practice to make available to the public at large, or that is provided as a matter of stated public policy for the use of public officials and municipal employees in the conduct of official business.

"(e) The failure to remove oneself from the decision-making process in cases set forth in subsection 12 5/8-7 (i).

"(f) No public official or municipal employee shall accept any fee or honorarium for an article, appearance, or speech, or for participation in an event in the official's or employee's official capacity, provided that but they may accept reimbursement of necessary expenses incurred that are due to such activity or participation, if those are disclosed within thirty (30) days of the activity or the reimbursement, whichever is later.

"(g) No public official or municipal employee shall knowingly provide false or misleading information to the public.

"(h) No public official or municipal employee shall take any action in retaliation against any person who makes a complaint or allegation of unethical conduct in accordance with the procedures outlined in this chapter with regard to the standards of conduct delineated herein.

"(i) The foregoing prohibited practices are also sufficient for an appropriate authority to impose discipline in accordance with the City Charter, this chapter, the city's executive management compensation plan, and/or any applicable collective bargaining agreement."

[17] As previously indicated in this opinion, in its letter terminating Jefferson's employment, the city alleged that, in 2004, Jefferson solicited a $15,000 bribe from Artnel Banton, the owner of Lab Restoration and Construction, LLC, in exchange for overlooking various noncompliance issues. See footnote 8 of this opinion. In rejecting the city's claim, the panel found, inter alia, that there was no evidence that Banton had a contract with the city in 2004. The panel also questioned why Banton never reported the bribe to city officials, the board or the police. It also found that Banton's testimony that it was difficult for him to secure work with the city after he refused to pay the bribe was not supported by the evidence, which indicated that he was awarded contracts "in 2006 and at least through 2008." Before the panel, the union "questioned 'the nature of the [c]ity's discovery of [Jefferson's] alleged misconduct . . . [arguing that the] [c]ity, without ever speaking to any of the thousands of contractors who interacted with . . . Jefferson incredibly discovered . . . Banton but thereafter made no attempt to ascertain whether she [had ever] solicited any other bribes [from any other contractors].' " In the arbitration award, the panel also noted that Banton "did not report the bribe solicitation until interviewed in 2015, though the evidence indicates that he had contact with the police in connection with [an] incident with CWI2 staff in 2006," which resulted in the police issuing him a citation warning him "to stay away from the [commission's] office."

[18] We note that the panel's finding in this regard conformed to the city's framing of the issue, which was not that Jefferson had solicited a bribe by seeking charitable donations in lieu of fines but, rather, that she had acted "in defiance of the direct advice [of the] corporation [counsel's] office." (Internal quotation marks omitted.)

[19] As previously indicated, although Jefferson was terminated on August 5, 2015, the panel awarded her back pay and benefits only "for the period starting on August 1, 2017, through [the] date of reinstatement."

[20] The union complains, and we agree, that the city, throughout its brief to this court, mischaracterizes the nature of the panel's findings. Although the city leveled extremely serious charges of misconduct against Jefferson, it failed to prove the most serious of those charges. For example, in addition to rejecting the city's claim that Jefferson attempted to solicit a bribe from Lab Restoration and Construction, LLC, the panel also rejected the city's claim that Jefferson had threatened another contractor, Brack Poitier, during a telephone call. In so doing, the panel noted the flimsy nature of the city's evidence, stating in relevant part: "It is noted as the union points out, that there is no evidence that . . . Poitier made any claim of misconduct against . . . Jefferson, [the commission] or CWI2 prior to his 2015 interview, though the threat was alleged to have taken place in the course of a telephone call from . . . Jefferson to . . . Poitier just before Memorial Day weekend, 2014. Of course, an allegation of a threat is a serious matter. In this case, the perceived threat, according to . . . Poitier, consisted of . . . [Jefferson's] asking, in the course of a telephone conversation, if . . . Poitier intended to have any [Sheetrock] workers over the Memorial [Day] weekend at the 603 Orchard Street, New Haven site, and . . . that [the commission] would be watching and might inspect the property. The city referred to this scenario, as . . . Poitier explained to the interviewer, as [the commission applying] 'heightened scrutiny' . . . though it does not argue that [that] scrutiny itself . . . would amount to a threat. . . . [With respect to Jeffer-

son's question about Sheetrock workers], the union argued that . . . [chapter 12 1/2, article II, §] 12 1/2-24 (c) [of the New Haven Code of Ordinances] . . . requires that all firms doing business in the city shall utilize city sponsored recruitment and training programs. . . . It is undisputed that CWI2 was the only city sponsored recruitment and training program. Thus, any effort by [Jefferson] and [the commission] to encourage the contractors to utilize graduates to avoid future compliance issues with [the commission] was not only proper but was required by the city's own rules. . . . Taking these factors into account and attempting to understand the essence of the perceived threat, it is concluded that substantial proof of a threat is not evident. Furthermore, it is noted that, [although] two city . . . investigators . . . and . . . the Federal Bureau of Investigation among other agencies . . . were involved to look into . . . Jefferson's interactions with the contractors doing business with the city, there is no evidence in the record that, on or about May 24, 2014 . . . Poitier received a [threatening] telephone call from . . . Jefferson," as the city claims. (Citations omitted; internal quotation marks omitted.)

[21] Before the panel, the city acknowledged that Jefferson's job required her to enforce chapter 12 1/2 *and* to fundraise for CWI2; it argued, however, that "[b]lending enforcement and fundraising create[d] a conflict of interest." To demonstrate just how blurred the ethical lines could become, the panel found that, in April, 2014, John Moriarty, a contractor doing business with the city, "received an invitation from CWI2 to attend a fundraiser . . . . On April 9, 2014, Moriarty provided a check for $10,000 for the occasion. . . . On the same date, a preaward conference took place which involved [the commission], Moriarty and the subcontractors for the 100 College Street project. . . . There does not appear to be [any] question regarding the solicitation and receipt of the donation, [which] as the union points out . . . '*was made with the full knowledge and participation of the [c]ity.*' " (Citations omitted; emphasis added.) Chapter 12 1/2, article II, § 12 1/2-26 (a), of the New Haven Code of Ordinances explains that a preaward conference occurs "prior to award of a contract" and that, "[a]t such pre-award conference the contract compliance director shall . . . determine whether or not the apparent successful bidder has complied with sections 12 1/2-22 through 12 1/2-25, and then shall submit his determination and recommendation thereon to the commission and the director of the department involved. After receiving the recommendation of the contract compliance director, the executive director of the commission shall process the award recommendation to the awarding agency."

[22] According to the arbitration award, "on or about June 9, 2009, [commission] staff, under the direction of . . . Jefferson, as [e]xecutive [d]irector, prepared another [memorandum] to resolve a noncompliance issue by payment of [a] $10,000 fine. . . . [T]he [memorandum] was prepared for . . . Jefferson's signature, and contained a notation copying several people, including two representatives from Gilbane [Inc.], and Economic Development [Administrator] Kelly Murphy." (Citation omitted.)

[23] As previously indicated in this opinion, CWI2 was not spun off into a separate entity until 2011.